Filed 5/31/24  In re D.T. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.T. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E082126 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J292608, J292609, J292610) |
| v. | OPINION |
| S.T., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel and Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

Defendant and appellant S.T. (Father) appeals August 30, 2023 orders denying Father reunification services for his three children, S.T., J.T., and D.T., pursuant to Welfare and Institutions Code section 361.5, subdivisions (b)(3) and (b)(7).[1] Father claims that even if these bypass provisions apply, and authorized the court to bypass or deny services for Father, the court erred in denying services for Father because it was in the children's best interests to reunify with Father.  (§ 361.5, subd. (c)(2).)  We conclude 1) the bypass provisions apply, and 2) the court did not abuse its discretion in concluding it would not be in the best interest of the children to reunify with Father, and therefore, to deny Father reunification services.  Thus, we affirm the orders bypassing Father's services.

## II.  FACTS AND PROCEDURE

A. *Background*

Father and A.G. (the mother) are the parents of S.T., a boy born 2011, J.T., a girl born in 2015, and D.T., a boy born in 2017.  In March 2022, the mother and children were living with the mother's boyfriend, M.F.  The mother and children had not seen Father since September 2021 when Father was arrested and jailed for violating a 2019 domestic violence restraining order in favor of the mother.  Father was released from custody on March 6, 2022.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

On March 21, 2022, D.T., then age four, was taken to a hospital emergency room and found to have severe physical injuries consistent with nonaccidental trauma: two spinal fractures, six rib fractures in an "L" shape on his left side, a third degree burn on his left leg, a cut in a "Y" shape on his left hand, bruises on his body and head in different stages of healing, including bruising on his penis and on the inside of his lower lip. The incident was referred to plaintiff and respondent, San Bernardino County Children and Family Services (CFS).

When a social worker questioned D.T. about his injuries at the hospital, D.T. said M.F. had been "hurting him" by pouring hot water on him and by putting M.F.'s hand on D.T.'s mouth so that D.T. could not breathe. When asked whether he wanted to see MF., D.T. said, "no because he [is] mean. He make[s] me bleed." When asked whether he wanted to see his mother, D.T. said, "no, she's not gonna pick me up anymore." When asked whether he wanted to see Father, D.T. said, "no, [Father] [s]creamed at me. Made me cry at my normal house."

The mother gave inconsistent versions of how D.T. sustained his injuries. Mother reported she was married to Father but had had no contact with Father since September 2021, when Father was arrested for violating a domestic violence restraining order granted in favor of the mother. The mother said she lived with the children and that her boyfriend, M.F., only "randomly" spent the night. The mother worked full time, and M.F.'s mother watched D.T. while the mother was at work and S.T. and D.T. were at school. M.F. watched S.T. and D.T., but not J.T., when the mother would "go on a quick errand." S.T. and J.T. denied knowing how D.T. was injured. After speaking with the

3

mother and children, CFS took the children into protective custody. Given the ongoing police investigation of D.T.'s injuries, CFS was unable to speak with M.F.

CFS attempted to locate Father and found no address but discovered Father was arrested for domestic violence on September 2, 2021 and released from custody on March 6, 2022. On March 23, 2022, Father called CFS after the maternal grandmother told Father the children were in protective custody. Father confirmed he had been released from custody around two weeks earlier and said he had not seen the children "in months" due to the restraining order against him. Father said he would like the children in his care, and he was in the process of submitting "paperwork" in the family court to obtain custody of the children.

B. *The Section 300 Petitions and Detention Hearing (March 2022)*

On March 24, 2022, CFS filed petitions alleging the children were described in section 300, subdivisions (a), (b)(1), (c), (d), (e), (g), and (i). The petitions alleged D.T. suffered non-accidental, serious, and repeated physical harm while in the care of his mother; the mother failed to protect D.T. from serious physical harm, serious emotional damage, and sexual abuse; the parents engaged in domestic violence with each other in the presence of the children; all of this conduct placed all three children at risk. On March 25, the children were ordered detained outside parental custody. Father was granted supervised visitation, but the mother was ordered to have no contact with the children. Father waived his trial rights on the allegations and agreed to participate in predispositional reunification services, including on-demand drug testing and domestic violence classes.

4

C. *Further Investigation of the Section 300 Allegations (March 2022 to June 2022)*

1. M.F.'s Abuse of D.T.

M.F. admitted to police he "lost it" and physically abused D.T. after D.T. "acted out' at a theme park on March 9. M.F. grabbed and pulled D.T. by the arm, causing D.T.'s arm to swell. In a second incident on March 19, apparently at mother's home with the children, M.F. took D.T. to the "restroom," sat D.T. on the toilet, and, when asked whether he had peed, D.T. said "no, not yet." M.F. then grabbed D.T.'s arm and pulled on D.T. to get up, then "punched" D.T. four times on D.T.'s back while D.T. was seated on the toilet. M.F. then grabbed D.T. "from each side of his torso, lifted him and slammed [him] down to the floor with force," then squeezed D.T's torso with both hands after D.T. "landed on the tile floor." D.T. continued to cry, so M.F. slapped D.T. across the face. M.F. reported the Mother, S.T. and J.T. were "in the bedroom" when the March 19 incident occurred. M.F. denied causing injury to D.T.'s penis. The mother provided several versions of how D.T. was injured, changed her statements several times, and had no explanation for some of D.T's injuries. The mother did not seek medical attention for D.T. until March 21, 2022 because M.F. "begged" the mother not to.

2. The Children's April 25 Forensic Interviews

In a forensic interview on April 25 2022, D.T. said M.F. made him scared and he did not want to live with his mother and M.F. D.T. said his mother burned his foot because "she hates me", and M.F. broke his hand, poked his eyes with his fingers, and hit D.T. on multiple occasions. In separate forensic interviews, S.T. and J.T. said M.F.

5

would hit D.T. on his buttocks, arms, legs, and chest with a belt, flip-flop/slipper and hands resulting in bruising and red marks."

3. The Parents' History of Domestic Violence

Regarding the parents' history of domestic violence, CFS obtained police reports from November 9, 2019, October 3, 2020, and September 1, 2021. The November 9 report showed Father was arrested for domestic violence with the mother on November 9, 2019 "after an argument turned physical." The mother reported Father punched the mother in the nose, causing the mother's nose to bleed. S.T. told officers his parents were arguing because Father "did not want to pay bills anymore." Based on the November 2019 incident, the mother obtained a domestic violence restraining order against Father.

On October 3, 2020, Father was arrested for violating the restraining order after he entered the mother's home in violation of the order, and the mother locked herself and J.T. in a bathroom. On September 1, 2021, Father was again arrested for violating the restraining order. At that time, the mother said the children told the mother that Father had been "yelling at" the children and "putting them down" "throughout the day." The mother saw that Father was "acting strange." Father "disclosed methamphetamine use" to police. For violating the restraining order, Father was in jail from September 1, 2021 until March 6, 2022.

Father admitted having a history of domestic violence with the mother in the presence of the children. Father reported the mother was "very jealous" and a "big woman" who was "aggressive" and "violent" toward Father. The mother once held

6

Father against a wall, hid Father's car keys and shoes, and slapped Father. After Father tired of the mother's behavior and began hitting her back, Father was arrested in 2019, and the restraining order was issued against Father. Father claimed the order was modified in 2020 to a peaceful contact order, but he and the mother lived in the same property, and the mother continued to call law enforcement. Father claimed he no longer used alcohol or any controlled substances including methamphetamine. Father was referred for counseling, domestic violence, parenting, and drug testing services.

The mother claimed that, sometime before September 2021, the mother and Father used drugs together (cocaine and methamphetamine) for six months. The mother said Father "would pick fights with her when he was coming down from drugs and he would yell more," and was under the influence of drugs when he was arrested in September 2021 for violating the restraining order.

4. Additional Evidence

On April 2, 2022, a paternal cousin said the paternal grandmother (PGM) had raised the children since birth. The PGM lived with both parents, then the mother, until February 2022 when the mother moved away with the children and cut off all contact with the paternal family. According to the paternal cousin, the parents had marital issues due to the mother cheating on the Father. In December 2021, the paternal family learned the mother had been seeing M.F.

The PGM reported the mother was "aggressive" toward all of the children with a belt and hands, and the PGM and Father would intervene to protect the children from the

7

mother when the parents, children, and PGM lived together. The PGM said she was "more of a mother figure" for the children and the mother was "rarely home."

On April 26, 2022, the maternal grandmother (MGM) reported she had been caring for the children while the mother was at work, before the mother moved away with the children in February 2022. At that point, M.F. would not allow the mother to answer her phone or have contact with the maternal family, and the MGM did not know where the mother and children were living. The MGM later disclosed she saw bruising on D.T.'s cheeks, butt, and legs, in February 2002 and questioned the mother about the bruises. The mother, S.T., and J.T. told the MGM that D.T. hurt himself while playing on a bunk bed. The MGM also said Father had a substance abuse issue which caused the mother to have to work two jobs.

In April and May 2022, Father tested negative for controlled substances, and he was participating in services, including domestic violence classes and counseling. CFS reported Father was "very communicative" and had been "nothing less than cooperative" with CFS. Father was also "very mindful" of D.T.'s medical needs. A paternal aunt reported Father was working six to seven days per week, attending church, and going to the gym. In therapy, Father was presenting with posttraumatic stress symptoms due to M.F.'s severe physical abuse of D.T., and Father was "learning to use coping mechanisms (deep breathing, stretching, walking away) to deal with stressors and anxiety."

D.  *Father's Initial Visits with the Children*

On March 30, 2022. Father had his first supervised visit with S.T. and J.T. Father, S.T., and J.T. were laughing and playing together, and J.T. went to Father for comfort when she heard screaming from another room.  Father had his first visit with D.T. on April 2.  D.T. was still unable to walk due to his injuries but was comfortable engaging with Father, smiled at and reached for father, and cried for Father at the end of the visit. Father was always appropriate with the children during his weekly supervised visits; Father came prepared with games and activities and engaged well with the children. On several occasions, the children asked about returning to father's care.

On May 10, 2022, Father's visits were liberalized to unsupervised.  On June 18, J.T. reported Father yelled at her and her siblings during an unsupervised visit.  J.T. denied she was fearful of Father and explained Father became upset at the children and told them they need to respect Father.

On July 5, 2022, a maternal cousin called CFS to report that Father was no longer living in her home with D.T.  Father left the home with D.T. on July 5, the day after the cousin and Father had a disagreement.  The cousin said Father was "upset" due to "stressors such as work," CFS's involvement in his life, and the fact S.T. and J.T. were not in his care.  On July 7, S.T. and J.T. reported Father yelled at them and kicked a trash can during an unsupervised visit on July 6.  S.T. and J.T. said Father had been "upset lately."

On July 11, 2022, CFS held a meeting to address Father's behavior.  Father told CFS he was having a difficult time because S.T. and J.T. were not in his care, and he felt

sad and depressed because he was on a budget and unable to buy the children things. CFS stressed the importance of Father using his coping skills and support network. S.T. and J.T. participated in the meeting and said that even though Father yelled at them during their past two visits, they looked forward to visiting Father and wanted to live with Father. D.T. reported feeling happy and safe in Father's care. D.T. was described as "extremely bonded" to Father.

E. *The Original Jurisdiction and Disposition Orders (July 2022)*

On July 28, 2022, at the combined jurisdiction and disposition hearing on the section 300 petitions, the court dismissed the subdivision (g) allegations (that the mother left the children with no provision for support) and found the other allegations true. The court denied reunification services for the mother (§ 361.5, subds. (b)(5), (b)(6)), found Father was the children's presumed father, returned D.T. to Father's care with family maintenance services, and granted Father reunification services for S.T. and J.T. who remained in foster care.

On January 23, 2023, CFS reported D.T. was doing well in Father's care. Father was taking D.T. to his medical appointments and D.T.'s injuries had mostly healed. D.T. was meeting his developmental milestones but he was referred to a neurologist for his eye injury and for mental health services. Father was still participating in services; he had completed a parenting program, 35 of 52 domestic violence classes, and he was attending

10

individual counseling.[2] Father reported he had learned coping skills in counseling. Father was renting a three-bedroom, three-bath home for himself and all three children in anticipation of having J.T. and S.T. returned to his care. On January 30, 2023, the court continued D.T. in Father's care and returned S.T. and J.T. to Father's care, with family maintenance services for all the children.

F. *The Section 342 and 387 Petitions (May 2023)*

On May 1, 2023, three months after J.T. and S.T. were returned to Father's care, CFS filed subsequent and supplemental petitions for the children pursuant to sections 342 and 387. The petitions alleged that on four occasions between February 24, 2023 and April 24, 2023, Father physically abused 11-year old S.T. by punching and slapping S.T. on the face very hard, multiple times, and Father's conduct placed all three children at risk of similar abuse.

   1. Background

On February 24, 2023, J.T. disclosed that Father yelled at her and her siblings for no reason, and that one day Father "walked out of the kitchen and hit [S.T.] across the face really hard." J.T. said Father said J.T. and the children were "not supposed to say anything and not cause any trouble" and J.T. was scared to go home to Father. CFS concluded the referral would not be substantiated because the discipline Father used did not rise to the level of abuse.

_____

[2] The domestic violence classes were a condition of Father's probation for violating the 2019 restraining order. Father was in compliance with the conditions of his probation.

11

On March 7, 2023, S.T. disclosed Father hit him on his face very hard. CFS found this referral, too, would not be substantiated, but referred Father to counseling and advised him to use other forms of discipline. On March 16, S.T. disclosed Father "socked him on the jaw" two weeks earlier, and that on March 15, Father again "socked him on the jaw and slapped his face with an open hand." S.T. said he did not want to be around Father and feared returning home; Father would get angry and tell S.T. he does not like his attitude, then Father would hit S.T. S.T. had no observable marks or bruises. CFS concluded the March 15 incident would also be unsubstantiated. On April 24, another referral was made alleging Father's physical and emotional abuse of S.T. CFS decided to file the section 342 and 387 petitions while still investigating the April 24 referral.

The children were interviewed separately at school on April 25, 2023. D.T. said he had heard S.T. crying from Father smacking S.T., but D.T. did not remember the day he heard the smacking. J.T. said she saw Father put his hand on S.T.'s face, but it was "not hard." S.T. said he left home on April 24, after he talked to the social worker, and he went to the home of his prior foster parents, because Father looked like Father was going to hit S.T. When asked to explain, S.T. said Father clenched his fist, appeared angry, and told S.T. to "stop bothering him." S.T. was very frightened, held his hands up to block his face, and repeatedly apologized to Father. S.T. said Father was "imagining" that the children were "intentionally trying to agitate him when they do something on accident." S.T. confirmed that the prior referrals of Father hitting S.T. were true. S.T. wanted to live with the PGM.

When interviewed on April 26, 2022, Father said he was unsure why S.T. was alleging Father was physically and emotionally abusive toward S.T., and S.T. had no reason to feel threatened. Father said S.T. would try to find ways to make Father angry, but Father would try to ignore S.T.'s behavior. The children were taken into protective custody.

2. Detention

At a detention hearing on May 2, 2022, the court detained the children from Father and allowed Father weekly, two-hour supervised visits. On May 25, CFS interviewed each child about the allegations of Father's physical abuse. Father declined to discuss the allegations with CFS.

3. The Children's Further Interviews

In his May 25 interview, S.T. recalled the February 24 referral was made because Father slapped S.T. hard on his cheek "for no reason" when S.T., J.T., and D.T. were sitting on the living room couch watching television. S.T. recalled that Father told S.T. that S.T. was bothering Father and to stop it.

S.T. explained that the March 7 referral occurred after S.T. asked his former foster brother, who attended S.T.'s school, to tell S.T.'s former foster father to notify S.T.'s social worker that Father was hitting S.T. By that time, Father had been hitting S.T. more frequently, "every few days," by slapping S.T. with his open hand. The slapping incidents did not cause any marks or bruises, but one of the slaps made S.T.'s face hurt for a few days. When asked why Father was slapping him, S.T. said Father would

13

complain that S.T. was "bothering" Father, but S.T. would not be doing anything to bother Father.

S.T. described the March 16 referral as Father "sock[ing]" S.T. on the jaw with a closed fist, which hurt for a while. S.T. sometimes feared going home because he felt Father would hit him. S.T. said the April 24 referral occurred because Father asked S.T. to take out the trash, and S.T. told Father he would do so after he ate. Father raised his hand as if he was going to hit S.T., but S.T. apologized, pleaded with Father not to hit him, and Father did not hit him. S.T. ate, took the trash out, then went to his prior foster home and reported the incident. Following the incident, Father asked S.T. why S.T. "acts out," and S.T. told Father he acted out because he wanted to live with the PGM. S.T. felt he did not misbehave with Father and said Father was always angry at him and his siblings for no reason.

S.T. reported he and Father had a good relationship when S.T. was younger. Father never hit him and was a good provider to the family. S.T. recalled the family lived in Washington when S.T. was younger, but returned to California because they did not have enough money. They moved into the MGM's garage, then Father went to jail. S.T. said Father's "mindset is different" now because Father was very worried about what the mother and M.F. had done to D.T. S.T. confirmed he did not want to live with Father because he did not believe he would be safe with Father even if Father were to get help, but he wanted to visit Father.

J.T. said Father had never hit her, but she felt scared when Father yelled at her and her brothers and when he would say bad words in Spanish. Father would accuse J.T. and

14

S.T. of saying bad words to Father, but J.T. said Father was "hearing things" and had falsely accused S.T. of saying "F. . . you" to Father. Father would tell J.T. and S.T. that they had "ruined his life" and his life would be "different" if they were not at home with him. J.T. recalled a time when Father "skipped" into the living room, slapped S.T., then "skipped" back to the kitchen. Father appeared "happy" for having slapped S.T., but J.T. saw tears on S.T.'s face. Another time, J.T. heard S.T., who was cooking in the kitchen, "crying and screaming" telling Father to stop hitting him when S.T. was not doing anything wrong. J.T. wanted to live with the PGM. In his May 25 interview, D.T. said Father was "mean" to S.T. and J.T., and D.T. recalled hearing Father smack S.T. multiple times.

### 4. CFS's Recommendations

In a June 1, 2023 jurisdiction/disposition report, CFS recommended the court sustain the allegations of the sections 342 and 387 petitions and deny Father reunification services for the children pursuant to section 361.5, subdivisions (b)(3) and (b)(7). CFS concluded Father's prognosis for reunifying with the children was poor. Father's supervised visits with the children were going well, however, and CFS had no concerns about the visits. A June 6 hearing on the section 342 and 387 petitions was continued for further assessments.

### 5. The August 30, 2023 Findings and Orders Denying Father Services

At the August 30, 2023 contested hearing, the court sustained the allegations of the petitions. Father's counsel argued section 361.5, subdivisions (b)(3) and (b)(7) did not apply to Father, and even if the statutes applied, the court should order reunification

15

services for Father because Father could reunify with the children within the next six months. The court found that the bypass provisions applied and that granting Father services would not serve the best interest of the children. Father timely appealed.

## III.  DISCUSSION

Father claims that even if section 361.5, subdivisions (b)(3) and (b)(7) applied and authorized the court to deny Father services, the court erroneously denied Father services because reunifying with Father was in the children's best interest. (§ 361.5, subd. (c)(2).) We conclude that section 361.5, subdivisions (b)(3) and (b)(7) applied. We also conclude the court did not abuse its discretion in denying Father services, because substantial evidence shows the court reasonably determined that reunifying with Father was not in the children's best interest. Thus, we find no error in the August 30, 2023 orders.

A. *Section 361.5, Subdivisions (b)(3) and (b)(7) Apply*

When a child is removed from a parent's custody, the parent is generally entitled to reunification services for the child under section 361.5, subdivision (a), unless an exception set forth in subdivision (b) of the statute applies. "Section 361.5, subdivision (b) provides exceptions to the general entitlement to reunification services set forth in section 361.5, subdivision (a)." (*In re A.G.* (2012) 207 Cal.App.4th 276, 280.)

Under subdivision (b), reunification services "need not be provided" to a parent when the court finds by clear and convincing evidence that an exception set forth in section 361.5, subdivision (b) applies. (*In re S.B.* (2013) 222 Cal.App.4th 612, 622.) These exceptions allow the court to "bypass" services for the parent and reflect our

16

Legislature's intent to provide services to parents "only where those services will facilitate the return of children to parental custody." (*Ibid.*)

"Consonant with the general presumption in favor of mandatory reunification services, the bypass provisions are 'narrow in scope' and reach situations where ' "the likelihood of reunification" ' is ' "so slim" ' due to a parent's past failures that 'expend[ing]' the Department's ' "scarce" ' resources on reunification services is likely to be 'fruitless,' or when 'attempts to facilitate reunification' would otherwise not 'serve and protect the child's interest.' [Citations.]   By making the grant of reunification services discretionary in these situations, the bypass provisions aim to 'focus reunification efforts' and resources on the cases 'most likely to succeed' with reunification. [Citation.]" (*In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1271.)

As relevant, section 361.5, subdivision (b) provides: "(b) "Reunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence . . . [¶] . . . [¶] (3) That the child or a sibling of the child has been previously adjudicated a dependent pursuant to any subdivision of Section 300 as a result of physical or sexual abuse, that following that adjudication the child had been removed from the custody of the child's parent or guardian pursuant to Section 361, that the child has been returned to the custody of the parent or guardian from whom the child had been taken originally, and that the child is being removed pursuant to Section 361, due to additional physical or sexual abuse. [¶] . . . [¶] (7) That the parent is not receiving reunification services for a sibling . . . of the child pursuant to paragraph (3). . . ."

"If the court finds by clear and convincing evidence that a bypass provision applies, it must deny services unless the parent proves that services would be in the child's best interests. (§ 361.5, subd. (c).) While the parent bears the burden of proof on that issue, the department bears the burden of proving the threshold issue of whether a bypass provision applies. [Citation.]" (*In re T.R.* (2023) 87 Cal.App.5th 1140, 1148.) We review a juvenile court's determination that a bypass provision applies for substantial evidence. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96 & fn. 6.)

Here, the court relied on subdivision (b)(3) of section 361.5, in denying Father reunification services for S.T. and J.T., and relied on subdivision (b)(7) of the statute in denying Father services for D.T. Substantial evidence supports the court's determinations that these bypass provisions applied.

First, S.T. and J.T. are children described in subdivision (b)(3) of section 361.5. They are (1) siblings of D.T., a child previously adjudicated a dependent pursuant to section 300 as a result of physical or sexual abuse; (2) following "that adjudication," S.T. and J.T. were removed from the custody of the mother, from whom D.T. was "originally" taken in the section 300 adjudication for D.T.; (3) S.T. and D.T. were later returned to Father's custody; and (4) S.T. and J.T. were later removed from Father's custody due to "additional physical abuse" of S.T.

Second, D.T. is a child described in subdivision (b)(7) of section 361.5. That is, D.T. has a sibling—two siblings, S.T. and J..T.—for whom "the parent," Father, was not receiving services pursuant to subdivision (b)(3). (§ 361.5, subd. (b)(7).)

Father does not seriously argue section 361.5, subdivisions (b)(3) and (b)(7), do not apply.[3] Rather, Father's opening brief states, "Father's position is that even if the section 361.5, subdivisions (b)(3) and (b)(7) applied, it was in the best interests of the children for their father to receive reunification services under section 361.5, subdivision (c)(2)." We turn to this question.

B. *The Court Did Not Abuse Its Discretion in Concluding Reunification with Father Was Not in the Children's Best Interest, and Bypassing Services for Father*

Section 361.5, subdivision (c)(2), states: "The court shall not order reunification for a parent or guardian described in paragraph (3), (4), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), or (17) of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child."

A juvenile court may consider several factors in determining whether reunification would be in a child's best interest, including 1) the parent's current efforts, fitness, and history, 2) the gravity of the problem that led to the dependency; 3) the strength of the

---

[3] As Father concedes, section 361.5, subdivision (b)(3) has been interpreted as applying to a child who was subsequently physically abused even if that child was not the child who was abused in the prior adjudication. (*In re D.F.* (2009) 172 Cal.App.4th 538, 545.) That is, the statute does not require the child for whom services "need not be provided" to be the child who was originally abused; rather, the child for whom services "need not be provided" may be *a sibling* of the child who was originally abused. (*Ibid*.) Put yet another way, section 361.5, subdivision (b)(3) applies when, as here, the "additional" or subsequent abuse is to the sibling of the child originally abused. (*S.V. v. Superior Court* (2018) 28 Cal.App.5th 671, 676.) This interpretation is in keeping with the apparent purpose of the statute, which is "to protect children against recidivist abusive parents." (*Ibid*.) Further, the plain language of the statute does not require the parent for whom services "need not be provided" to be the perpetrator of the original abuse. (§ 361.5, subd. (b).)

parent-child and parent-caretaker bonds; and, 4) the child's need for stability and continuity, which is of "paramount concern." (*In re D.F., supra,* 172 Cal.App.4th at p. 547; *In re Ethan N.* (2004) 122 Cal.App.4th 55, 66-68.) The burden is on the parent to show that reunification would serve the best interest of the child. (*In re A.G., supra*, 207 Cal.App.4th 276, 281.) A best interest finding "also requires a likelihood that reunification services will succeed. [Citation.] 'In other words, there must be some 'reasonable basis to conclude' that reunification is possible before services are offered to a parent who need not be provided them. [Citation].' " (*Ibid.*)

We review a juvenile court's best interest finding under section 361.5, subdivision (c)(2) for an abuse of discretion. (See *Cheryl P. v. Superior Court, supra,* 139 Cal.App.4th at p. 96, fn. 6.) We will find no abuse of discretion if substantial evidence shows the court could have reasonably concluded that reunification with the parent who may be denied reunification services was not in the child's best interest. (See *Ramsden v. Peterson* (2022) 76 Cal.App.5th 339, 345 [an abuse of discretion shown if the child custody determination is not supported by substantial evidence].)

Father claims it was in the best interest of the children to reunify with Father; thus, it was in the children's best interest to offer reunification services to Father at the August 30, 2023 hearing. Father emphasizes that the bypass provisions of section 361.5, subdivisions (b)(3) and (b)(7) applied *only* because D.T. suffered physical abuse in *the mother's* care. Father points out he was not living with the family when D.T. was abused, and Father "was not part of any physical abuse" of D.T. Father also correctly observes that he cooperated with CFS from the beginning of the case in March 2022, he

20

complied with his case plan, and the children enjoyed visiting Father and being with Father.

Father also points out that there was no permanent plan for the children—at the August 30, 2023 hearing, the court found by clear and convincing evidence that there was a compelling reason not to set section 366.26 hearings for the children because 1) adoption was not in the children's best interest at the time, and 2) there was no adult willing or able to be the children's legal guardian.

Substantial evidence shows, however, that the court reasonably determined that reunification with Father was not in the children's best interest. (§ 361.5, subd. (c)(2).) As the court noted, Father was aware from the beginning of the case that D.T. had been "significant[ly]" physically abused, that S.T. and J.T. were removed "for the same risk," and that all of the children had experienced "significant trauma." But Father's physical abuse of S.T. caused the children's second removal in April 2023. As the court also emphasized, the children feared going home and were told by Father "not to speak about the abuse they were suffering" in Father's care. The children also corroborated each other's accounts of the Father's abuse.

As CFS argues, substantial evidence shows Father "had an extensive history of violent and abusive behavior that was not ameliorated by his participation and completion of reunification services." Despite his participation in individual counseling, domestic violence classes, and parenting classes, Father "continued to exhibit behavior that evidenced aggression, violence, and a lack of impulse control throughout much of the case. Indeed, Father yelled at the children during their unsupervised visit with Father in

21

July 2022. Moreover, Father continued to physically abuse S.T. despite referrals to counseling. And when interviewed in May 2023, S.T. and J.T. said that they did not want to live with Father because they would not feel safe in Father's care, even if Father were to get additional help.

In sum, the court reasonably determined that reunification was not in the children's best interest. Although we recognize and commend Father's efforts at reunification, the record shows there was no reasonable likelihood that reunification would succeed. (*In re A.G., supra,* 207 Cal.App.4th at p. 281.) Thus, the court did not abuse its discretion in denying reunification services for Father.

## IV.   DISPOSITION

The August 30, 2023 orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS           
                                                                                    J.

We concur:

RAMIREZ           
                    P. J.


MENETREZ           
                    J.

22